IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ZYKEEM JOHNSON, | No. 1:20-CV-02137 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| B. FISHER, *et al.*, | |
| Defendants. | |

MEMORANDUM OPINION

AUGUST 16, 2022

Plaintiff Zykeem Johnson filed this *pro se* Section 1983[1] action, asserting constitutional and state-law tort claims against five prison officials at the State Correctional Institution, Smithfield (SCI Smithfield), in Huntingdon, Pennsylvania. Johnson claims that these officials failed to protect him from an assault by another inmate. Presently pending is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. The Court will grant in part and deny in part Defendants' Rule 56 motion.

---

[1] 42 U.S.C. § 1983. Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials. The statute is not a source of substantive rights; it serves as a mechanism for vindicating rights otherwise protected by federal law. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002).

I.     **FACTUAL BACKGROUND**[2]

At all times relevant to the instant lawsuit, Johnson was confined at SCI Smithfield.[3] Johnson worked as a certified peer support specialist (CPSS), and during the time at issue he was assigned to the Behavioral Management Unit (BMU).[4] A CPSS goes through extensive training and his or her duties consist of, among other things, acting as a mentor and role model for other offenders, teaching inmates communication skills and conflict resolution, assisting inmates with establishing and completing long-term goals, demonstrating and assisting other inmates with recovery, helping inmates to understand the prison grievance process, and providing general support to other offenders.[5]

On December 11, 2018, Johnson was conducting his normal CPSS rounds in the BMU.[6] While speaking with inmate Raphael Spearman, Johnson recalls that he was interrupted by inmate Kevin Coit, who asked Johnson to pass him hand-rolled cigarettes from a neighboring cell.[7] Johnson refused, explaining that the BMU

---

[2]   Local Rule of Court 56.1 requires that a motion for summary judgment be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. *Id.* Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. Docs. 14, 31. To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the Rule 56.1 statements.
[3]   Doc. 14 ¶ 6. Johnson is currently incarcerated at SCI Frackville. *Id.* ¶ 5.
[4]   *See id.* ¶¶ 7, 24.
[5]   *Id.* ¶¶ 12-13.
[6]   Doc. 30-2 ¶ 1.
[7]   *Id.*

2

Unit Manager—defendant B. Fisher—had explicitly prohibited that type of conduct. According to Johnson, Coit responded, "Fuck Fisher! We do what the fuck we want down here!"[8] Coit then attempted to get Johnson to bring him some tobacco from general population and pass it to him during a one-on-one session.[9] Johnson again refused, telling Coit that he would not smuggle contraband into the BMU.[10] Johnson attests that Coit, displeased with his responses, then "went on a profanity[-]laced tirade, which included threats" of throwing feces on Johnson and physically harming him when the opportunity presented itself.[11]

    Johnson avers that he abruptly ended his meeting with Spearman and went to Fisher's office to report the interaction with Coit.[12] Upon meeting with Fisher, Johnson attests that he recounted everything that had happened, including that Coit had become extremely angry with Johnson for refusing to smuggle tobacco to him and had threatened to "throw feces on [him] and beat [him] the fuck up as soon as he made phase."[13] Johnson recalls that Fisher told him that "Coit is a lost cause and there is nothing we can do to help him," and then thanked Johnson for adhering to the facility's rules and for refusing Coit's illicit requests.[14]

---

[8]   Id.
[9]   Id. ¶ 2.
[10]  Id.
[11]  Id.
[12]  Doc. 30-2 ¶ 4.
[13]  Id. ¶¶ 5-7.
[14]  Id. ¶ 7.

The next day, Johnson returned to the BMU for his scheduled rounds.[15] Upon entering "B" wing, he was immediately accosted by Coit, who asked him "what the fuck [he was] doing back down here."[16] Johnson attests that Coit then threatened, "I'm going to kill your fat-rat ass, and there is nothing your bitch ass can do to stop me!"[17] Johnson attempted to ignore Coit's threats and harassment and finished his BMU rounds.[18] When leaving the BMU, Johnson recounts that he encountered defendant Correctional Officer Yoder in the exterior hallway and informed Yoder that—for a second time—Coit had made serious threats of physical violence against him.[19] According to Johnson, Yoder's response was, "Coit is a nut case and nothing but trouble."[20]

On December 18, Johnson returned to the BMU to conduct his scheduled CPSS rounds.[21] Upon entering the BMU, he underwent a routine strip search by defendants Correctional Officer Killinger and Correctional Officer Shope.[22] Killinger and Shope then informed Johnson that he had to meet with Coit for a one-on-one CPSS session.[23] Johnson asserts that he immediately protested, explaining to Killinger and Shope that Coit had recently threatened to throw feces

---

[15] *Id.* ¶ 8.
[16] *Id.*
[17] *Id.*
[18] Doc. 30-2 ¶ 9.
[19] *Id.*
[20] *Id.*
[21] *Id.* ¶ 10.
[22] *Id.*
[23] *Id.*

on him and to seriously physically harm him for refusing to smuggle tobacco into the BMU.[24]

According to Johnson, Killinger and Shope "laughed [his] concerns off," telling him that "Coit don't like nobody."[25]  Johnson attests that he told Killinger and Shope that this situation was different and more serious because Coit had threatened to kill him, and further explained that he had reported Coit's threats to Fisher the previous week.[26]  Johnson recalls that Killinger's response was, "Yeah whatever, you still have to see him, this is a direct order."[27]

Johnson recounts that, on their way to the B wing dayroom, he made yet another plea to both officers to have a different CPSS worker conduct the one-on-one session with Coit in light of Coit's recent threats of violence.[28]  Johnson avers that both officers ignored his pleas and that Killinger's final response was, "This is your job, this is what you signed up for, so you have to do it."[29]  Shope purportedly stated, "You'll be fine.  You're twice as big as [] Coit."[30]

Once in the dayroom, Johnson maintains that he purposefully positioned himself in view of the dayroom's surveillance camera.[31]  Coit—who was not

---

[24] Doc. 30-2 ¶ 10.
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.* ¶ 11.
[29] *Id.*
[30] Doc. 30-2 ¶ 11.
[31] *Id.* ¶ 12.

5

wearing handcuffs, shackles, or any other means of restraint—was escorted into the dayroom by Killinger and Shope, who then exited the room and closed and locked the door.[32]  As Johnson predicted, Coit immediately began to physically assault him.[33]  Johnson alleges that Coit "repeatedly punched [him] in the face, neck, head, back and body."[34]  At some point during the attack, correctional officers deployed oleoresin capsicum spray ("OC" or "pepper" spray), which Johnson claims left him incapacitated and vulnerable to continued assault by Coit until officers were able to open the dayroom door and physically intervene.[35]

Johnson was then taken to a holding cell on A wing where he was allowed to rinse his face with cold water to counteract the OC spray.[36]  Johnson claims that, at this time, Killinger offered several apologies for not taking Johnson's warnings about Coit seriously.[37]  Johnson, however, admits that he was extremely angry and upset, and yelled at Killinger, "I [] told y'all not to lock me in there with him!  I [] told y'all he said he was going to beat me up!  I told y'all to call somebody else!  I [] told y'all he was going to try to kill me!"[38]  Johnson was then taken to medical for treatment.[39]  He alleges that he suffered "permanent bone disfigurement" or

---

[32] *Id.*
[33] *Id.*
[34] Doc. 7 ¶ 35.
[35] Doc. 30-2 ¶ 13.
[36] *Id.* ¶ 14.
[37] *Id.*
[38] *Id.*
[39] *Id.* ¶ 15.

"displacement" from the assault, and that he continues to experience physical and mental ailments from the attack.[40]

After exhausting his administrative remedies, Johnson filed suit in this Court in November 2020.[41] Johnson then amended his complaint as of right in January 2021.[42] He names as defendants Fisher, Yoder, Killinger, Shope, and Deputy Superintendent Rivello.[43] In his amended complaint, he alleges violations of his Eighth and Fourteenth Amendment rights by all Defendants for failure to protect him from Coit's attack.[44] He also asserts a state-law claim of negligence against each Defendant.[45] Defendants move for summary judgment on all claims against them.[46] Their Rule 56 motion is fully briefed and ripe for disposition.

## II.   STANDARD OF REVIEW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."[47] Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[48] Material facts are those "that could alter the outcome" of the litigation, and "disputes are

---

[40] Doc. 7 ¶¶ 55-56.
[41] *See generally* Doc. 1.
[42] *See generally* Doc. 7.
[43] *Id.* ¶¶ 4-8.
[44] *Id.* ¶¶ 45-50, 52, 54.
[45] *Id.* ¶¶ 51, 53.
[46] Doc. 13.
[47] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).
[48] FED. R. CIV. P. 56(a).

'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[49]

At the Rule 56 stage, the Court's function is not to "weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial."[50] The Court must view the facts and evidence presented "in the light most favorable to the non-moving party" and must "draw all reasonable inferences in that party's favor."[51] This evidence, however, must be adequate—as a matter of law—to sustain a judgment in favor of the nonmoving party on the claim or claims at issue.[52] A "scintilla of evidence" supporting the nonmovant's position is insufficient; "there must be evidence on which the jury could reasonably find for the [nonmovant]."[53] Succinctly stated, summary judgment is "put up or shut up time" for the nonmoving party.[54]

## III. DISCUSSION

Before addressing Defendants' Rule 56 arguments, the Court must identify the claimed constitutional violation or violations.[55] Johnson asserts that

---

[49] *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (*quoting Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).
[50] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).
[51] *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014).
[52] *Liberty Lobby*, 477 U.S. at 250-57; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-89 (1986).
[53] *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Liberty Lobby*, 477 U.S. at 252) (alteration in original).
[54] *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 391 (3d Cir. 2017) (quoting *Berkeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006)).
[55] *Albright v. Oliver*, 510 U.S. 266, 271 (1994) ("The first step in any [Section 1983] claim is to identify the specific constitutional right allegedly infringed."); *Graham v. Connor*, 490 U.S.

Defendants violated his Eighth and Fourteenth Amendment rights, but it is clear that Johnson's Section 1983 cause of action is a straightforward failure-to-protect claim under the Eighth Amendment. Johnson's invocation of the Fourteenth Amendment appears to be solely in the context of applying the Eighth Amendment's prohibition of cruel and unusual punishment to Pennsylvania through the Fourteenth Amendment.[56]

Defendants also read Johnson's amended complaint as raising both an Eighth Amendment failure-to-protect claim and an Eighth Amendment claim of deliberate indifference to inmate safety.[57] Those two claims, however, are one and the same when the "substantial risk to health and safety" is assault from another inmate.[58] Thus, Johnson's claims are (1) a Section 1983 claim against all Defendants under the Eighth Amendment for failure to protect, and (2) a state-law negligence claim against all Defendants. The Court will take Defendants' Rule 56

---

386, 394 (1989) (explaining that analysis of a Section 1983 claim requires "identifying the specific constitutional right allegedly infringed by the challenged" conduct).

[56] *See Holland v. Rosen*, 895 F.3d 272, 288 (3d Cir. 2018) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Defendants interpret Johnson's Fourteenth Amendment invocation as asserting a substantive due process claim, (*see* Doc. 15 at 25-27), but Johnson makes no such allegations or argument, and the Court declines to address a substantive due process claim that Johnson plainly has not raised. Johnson all but concedes that his constitutional claims arise under the Eighth Amendment but leaves it to "this Court" to "decide whether the claims are duplicative" and are subject to the more-specific-provision rule. *See* Doc. 30 at 18. Johnson's failure-to-protect claims are clearly covered by the Eighth Amendment, and thus the Fourteenth Amendment's substantive due process protections do not apply. *See Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 447-48 (3d Cir. 2020) (citation omitted).

[57] *See, e.g.*, Doc. 15 at 18.

[58] *See Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012), *abrogated on other grounds by Mack v. Yost*, 968 F.3d 311 (3d Cir. 2020) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

challenges to each claim in turn.

### A.     Eighth Amendment Failure to Protect Claims

"Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society."[59] Prison officials, therefore, have "a duty to protect prisoners from violence at the hands of other prisoners."[60] To establish an Eighth Amendment failure-to-protect claim against a prison official, the inmate must show that "(1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to [the prisoner's] health and safety, and (3) the official's deliberate indifference caused [the prisoner] harm."[61] In this context, deliberate indifference is a subjective standard; that is, "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety."[62] Actual knowledge or awareness of a substantial risk to an inmate's safety can be proven "in the usual ways, including inference from circumstantial evidence."[63]

Defendants argue that Johnson has not carried his burden to establish a failure-to-protect claim against Fisher, Yoder, Killinger, or Shope.  They also

---

[59]   *Bistrian v. Levi*, 696 F.3d 352, 366 (3d Cir. 2012), *abrogated on other grounds by Mack v. Yost*, 968 F.3d 311 (3d Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).
[60]   *Id.* (quoting *Farmer*, 511 U.S. at 833).
[61]   *Id.* at 367.
[62]   *Id.* (quoting *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001)).
[63]   *Id.* (quoting *Farmer*, 511 U.S. at 842).

10

contend that Rivello had no personal involvement in the incident and cannot be subject to supervisory liability because Johnson has not proffered any evidence of a policy implemented by Rivello that led to a violation of Johnson's constitutional rights.

### 1. Failure to Protect – Fisher, Yoder, Killinger, and Shope

Johnson has carried his burden at summary judgment with respect to his failure-to-protect claims against Yoder, Killinger, and Shope. He has not done so for his claim against Fisher. Specifically, Johnson has not proffered any evidence that Fisher was deliberately indifferent to an excessive risk of harm to Johnson or that Fisher's deliberate indifference caused Johnson's harm.

Taking the evidence in a light most favorable to Johnson, the nonmovant, the record reflects that Fisher was made aware of Coit's threats of violence on December 11, as Johnson attests that he informed Fisher about Coit's threats immediately after they were made. Johnson likewise produced an affidavit indicating that inmate Spearman personally witnessed Coit's threatening conduct and that Fisher was aware of it because, on December 11, Coit continued to make verbal threats against Johnson to Fisher after Johnson left the BMU.[64]

---

[64] Doc. 30-4 ¶ 2. Spearman specifically attests that Coit told Fisher that "he better not bring cop ass Johnson back down here" because Johnson is "a fucking cop and when [Coit] catch[es] his bitch ass [he's] going to fuck him up." *Id.* Spearman recalls that "Fisher just laughed it off and said, 'good luck.'" *Id.*

But that is where Johnson's claim with respect to Fisher's involvement ends. Johnson does not provide any evidence that Fisher was deliberately indifferent to a substantial risk of serious harm to Johnson (*i.e.*, actual physical assault by Coit), or that Fisher's deliberate indifference caused Johnson's assault. Certainly, an inference can be drawn from the record that Fisher was aware that Coit was an *abstract* danger to Johnson. But nothing in the record indicates that Fisher knew or had reason to know that Johnson was going to be put into harm's way—that is, that he would be placed alone into a locked room with an unrestrained Coit. Simply put, there is no evidence showing that Fisher knew or had reason to know that Coit would have unrestricted access to Johnson to make good on his threats of violence.

Instead, the evidence points to Yoder, Killinger, and Shope evincing deliberate indifference to serious harm, which indifference resulted in Johnson's injuries. As previously noted, Johnson avers that he personally informed Yoder of Coit's threats of violence on December 12. Johnson additionally attests that, on the day of the assault, he told Killinger and Shope multiple times about Coit's serious threats of physical violence and pleaded with them not to place him in a one-on-one session with Coit. He further avers that Killinger and Shope ignored these pleas and delivered an unrestrained Coit into the dayroom and locked the door behind them.

Spearman attests that, on the day of the assault, Yoder, Killinger, and Shope were present when Coit requested to see Johnson as a CPSS, and that Coit

12

explicitly asked Killinger if Johnson would be the responding CPSS.[65] Spearman states that, when Killinger responded that Johnson was on the CPSS schedule that day and usually always showed up, Coit replied, "Good because I owe his fat-cop ass an ass whooping."[66] Killinger allegedly shrugged off Coit's threats and jokingly said, "Johnson would squash you."[67] When Coit retorted that Johnson was too slow to catch him, Killinger purportedly responded, "Well we will see because Johnson should be here shortly," and Coit shot back, "we will."[68]

Johnson additionally supplied a copy of a December 18, 2018 grievance filed by Jamel Brockington (another BMU inmate) asserting that Coit made explicit threats that day about harming Johnson in the presence of the "2-10 shift" officers but those threats were ignored.[69] The grievance states that the officers heard Coit "make at least ten threats to CPS Johnson" and did nothing.[70] As such, Johnson has proffered evidence sufficient to create a genuine dispute of material fact that (1) Yoder, Killinger, and Shope had reason to suspect that the December 18 assault would occur and (2) their actions (or inactions, in Yoder's case) facilitated that assault.

---

[65] *Id.* ¶¶ 4-5.
[66] *Id.* ¶ 5.
[67] *Id.*
[68] *Id.*
[69] Doc. 30-8 at 2-3. Defendants challenge the admissibility of this evidence. *See* Doc. 37 at 17-18. But just because the grievance itself might be inadmissible as hearsay (which is not at all certain), it does not follow that its contents "could not be presented in a form that would be admissible in evidence," such as testimony by Brockington about what he personally witnessed on the day in question. *See* FED. R. CIV. P. 56(c)(2).
[70] *Id.* at 3.

In sum, Johnson has proffered evidence to satisfy the elements of a failure-to-protect claim against Yoder, Killinger, and Shope, but not as to Fisher. Summary judgment, therefore, will be granted in Fisher's favor on this Eighth Amendment claim but denied as to Yoder, Killinger, and Shope.

### 2. Supervisory Liability – Rivello

As Defendants observe, and Johnson concedes, the amended complaint does not allege direct personal involvement by Rivello in the failure-to-protect incident. Nor does the amended complaint indicate that Rivello was aware of Coit's threats of violence. Instead, Johnson contends that Rivello should be held liable under Section 1983 for failing to implement a policy that would have prevented the December 18 attack. Specifically, Johnson posits that "Rivello failed to establish a policy and/or protocol prohibiting CPSS workers from being locked in a room with unrestrained BMU residents."[71]

It is well established that, in Section 1983 actions, liability cannot be "predicated solely on the operation of *respondeat superior*."[72] Thus, supervisors cannot be held liable for the constitutional torts of their subordinates simply because of their supervisory position.[73] However, supervisors may be liable under Section 1983 in certain circumstances, including for failing to implement a policy

---

[71] Doc. 30 at 6.
[72] *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (affirming same principle in *Bivens* context).
[73] *Iqbal*, 556 U.S. at 676.

14

or procedure.[74] To establish such a claim, the plaintiff must "(1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the [subordinate]'s violation resulted from the supervisor's failure to employ that supervisory practice or procedure."[75]

Johnson's supervisory claim against Rivello fails on at least the third and fourth elements. Johnson has produced no evidence that Rivello was aware that an unreasonable risk of assault existed absent the identified practice (prohibiting CPSS workers from being locked in a room with unrestrained BMU residents). Nor has Johnson produced evidence that Rivello was deliberately indifferent to that risk.

For example, there is no evidence that any such attack ever occurred in the past or that there was a pattern of such incidents,[76] nor is there evidence that any of the involved correctional officers (or anyone else, for that matter) had previously put a CPSS worker in a room with an unrestrained BMU resident who then attacked the worker.[77] Johnson claims that "the facts known to defendant Rivello"

---

[74] See Brown v. Muhlenberg Township, 269 F.3d 205, 216 (3d Cir. 2001).
[75] Id. (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989)).
[76] See Beers-Capitol v. Whetzel, 256 F.3d 120, 134 (3d Cir. 2001); Sample, 885 F.2d at 1118.
[77] It appears that, following Coit's attack on Johnson, prison officials took corrective measures to avoid a similar situation. SCI Smithfield Superintendent J. P. Luther explained, in the

are sufficient to take his claim to a jury.[78]  Yet the only "facts" to which Johnson points are Department of Corrections regulations that show that inmates confined in the BMU have—among other things—"demonstrated problematic behavior in less secure environments," have "chronic disciplinary issues," and "demonstrate an inability to adapt to the general population setting."[79]

Contrary to Johnson's contentions, these regulations do not establish that Rivello was aware of an unreasonable risk of injury and was deliberately indifferent to it.  As Defendants explain, Johnson ignores the extensive, multi-step phase system in place in the BMU that determines inmates' activity restrictions based on their progress within the BMU program.[80]  Furthermore, this is not a case where there is "so great and so obvious" a risk that a constitutional violation would result from the absence of a specified policy that its absence "will alone support findings of an unreasonable risk, [] knowledge of that unreasonable risk, and [] indifference to it."[81]

Although Johnson identifies what he believes to be a missing policy or "protocol" at SCI Smithfield, he has not proffered any evidence to establish the

---

grievance appeal response, that "[t]he practice of locking dayroom doors has since been changed as a best practice," but also noted that "staff did not violate any policies by securing the doors previously." Doc. 30-3 at 15. Defendants correctly observe that such subsequent remedial measures would likely be inadmissible at trial.  *See* FED. R. EVID. 407.

[78] Doc. 30 at 6.
[79] *Id.* at 6-7 (quoting Doc. 30-7 at 2, 9-10).
[80] *See* Doc. 30-7 at 16-21.
[81] *Sample*, 885 F.2d at 1118; *see Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989).

16

necessary *mens rea* for Rivello such that a jury could reasonably find in Johnson's favor on the supervisory liability claim.[82]  Without some evidence of awareness of an unreasonable risk of injury and deliberate indifference thereto, Johnson cannot maintain his Section 1983 claim against Rivello.  The Court must therefore grant judgment in Rivello's favor on Johnson's Eighth Amendment failure-to-protect claim.

### B.   State-Law Negligence Claims

Defendants next argue that Johnson's state-law negligence claims are barred by state statutory immunity.  The Court agrees.

Commonwealth parties acting within the scope of their employment generally are immune from suit except when immunity is explicitly waived.[83]  Pennsylvania's General Assembly has carved out certain limited exceptions from its grant of sovereign immunity to Commonwealth actors.[84]  Section 8522(b) of Title 42 of the Pennsylvania Consolidated Statutes provides ten narrow categories[85] where the state has waived its sovereign immunity for claims involving negligent

---

[82] *See Tafoya v. Salazar*, 516 F.3d 912, 922 (10th Cir. 2008) ("At the summary judgment stage, the requirement of deliberate indifference imposes a burden on the plaintiff to present evidence from which a jury might reasonably infer that the prison official was actually aware of a constitutionally infirm condition.").

[83] *See* 1 PA. CONS. STAT. § 2310; 42 PA. CONS. STAT. §§ 8521, 8522(a).

[84] *See generally* 42 PA. CONS. STAT. §§ 8521, 8522.

[85] The ten exceptions set forth in 42 PA. CONST. STAT. § 8522(b) concern: (1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody or control of animals; (7) liquor store sales; (8) National Guard activities; (9) toxoids and vaccines; and (10) sexual abuse.

conduct by Commonwealth parties.[86]  This state statutory immunity applies to both negligent and intentional torts committed by Commonwealth actors.[87]  Because statutory immunity is an affirmative defense, the defendant bears the burden of establishing that his conduct was within the scope of employment.[88]

Johnson does not claim that any of the ten exceptions to immunity apply.  His only argument in opposition to statutory immunity is that Defendants were not acting within the scope of employment when the alleged torts occurred.  He contends that "the conduct of the defendants was not the kind they were employed to perform"; that is, the Department of Corrections "did not employ the defendants to deliberately place [Johnson] in danger then fail to prevent an attack resulting from that danger."[89]

Johnson's argument is an oversimplification of the scope of employment analysis.  Under Johnson's framing, any time a Commonwealth employee commits a negligent action they would necessarily fall outside the scope of employment (and thus be subject to liability) because no Commonwealth entity tasks its employees with committing tortious acts.

Instead, whether a state official's conduct is within the scope of employment is determined by considering if (1) "it is the kind he is employed to perform," (2) it

---

[86] *See id.* § 8522(a), (b).
[87] *See La Frankie v. Miklich*, 618 A.2d 1145, 1149 (Pa. Commw. Ct. 1992).
[88] *Justice v. Lombardo*, 208 A.3d 1057, 1068 (Pa. 2019).
[89] Doc. 30 at 19.

occurs "substantially within the authorized time and space limits," and (3) "it is actuated, at least in part, by a purpose to serve" the employer.[90] As to Fisher, Yoder, and Rivello, Johnson's only assertion is that they did not take affirmative steps to prevent the assault, like instituting a policy to keep unrestrained BMU residents from meeting with CPSS workers. Yet deciding whether or not to implement a policy is quintessentially *within* the scope of employment for a prison official. And Johnson does not plead or explain how Yoder's or Fisher's alleged inaction during the time in question falls outside the scope of employment such that they should be subject to a negligence lawsuit.

As for Killinger and Shope, their conduct (while potentially tortious), was also clearly within the scope of employment. Specifically, on December 18, 2018, Killinger and Shope were working "within the authorized time and space limits" of their jobs, and were performing the type of work they were employed to perform, as they were responding to a request for a CPSS meeting by a BMU resident. These actions were likewise "actuated, at least in part, by a purpose to serve" their employer, as they were ostensibly attempting to resolve a BMU resident's request for one-on-one CPSS services.[91]

---

[90] *Justice*, 208 A.3d at 1067 (citing RESTATEMENT (SECOND) OF AGENCY § 228(1) (1958)).
[91] *See, e.g.*, *Hill v. Barnacle*, 655 F. App'x 142, 148 (3d Cir. 2016) (nonprecedential) (explaining that "even unauthorized acts may be within the scope of employment if they are clearly incidental to the master's business" (quoting *Brumfield v. Sanders*, 232 F.3d 376, 381 (3d Cir. 2000))).

Defendants have met their burden to show that they were acting within the scope of employment during the time in question. Because there is no genuine issue of material fact as to scope of employment, state statutory immunity bars Johnson's negligence claims. These claims, therefore, must be dismissed for lack of subject matter jurisdiction.[92]

## IV.   CONCLUSION

Based on the foregoing, the Court will grant in part and deny in part Defendants' motion (Doc. 13) for summary judgment. The Court will grant Defendants' Rule 56 motion as to Johnson's Fourteenth Amendment failure-to-protect claims against defendants Fisher and Rivello. The Court will deny Defendants' motion as to Johnson's Fourteenth Amendment failure-to-protect claims against defendants Yoder, Killinger, and Shope. Johnson's state-law negligence claims will be dismissed for lack of subject matter jurisdiction, as they are barred by state statutory immunity. An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[92] *See Gary v. Pa. Human Relations Comm'n*, 497 F. App'x 223, 227 (3d Cir. 2012) (nonprecedential) (holding that, because state statutory immunity barred state-law claims, subject matter jurisdiction was lacking and claims were properly dismissed).